UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RAY D. HAMILTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 11-99-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| PIKE COUNTY, KENTUCKY, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Ray Hamilton entered the Pike County Medical Center after twenty days in the Pike County Jail.  Doctors at the hospital diagnosed him with (among other things) acute kidney failure, muscle breakdown, high blood pressure, and a hematoma in his lower back.  The question in this case is whether any of the defendants' actions during those twenty days violated Hamilton's constitutional right to medical treatment or were the cause of Hamilton's illnesses.  Six of the eight defendants filed for summary judgment because they believe the answer to that question is no.  For the reasons given below, the motions are granted in part and denied in part.

**BACKGROUND**

Ray Hamilton was booked into the Pike County Jail on September 7, 2010, for consuming alcohol in violation of the terms of his probation.  R. 43-1; R. 47-1 at 5.  Upon admission he responded to a series of screening questions.  Hamilton said that he had a "serious medical condition" that did not need immediate medical attention but might require treatment during his incarceration.  R. 43-2.  He elaborated that he suffered from high blood

pressure, neck and back pain, and sleeping problems.  R. 50-1 at 34.  Hamilton also said that he was taking medications that needed to continue during his time at the jail.  *Id.* at 34.  The next day, Nurse Tina Clevenger completed a "medical staff receiving screening form."  The form listed Hamilton's medications, prior diagnoses of high blood pressure and Hepatitis C, and his consumption of six beers the day before he was admitted.  R. 43-5.

After about ten days in a general population cell, Hamilton complained that he was having trouble breathing and could not stand without pain.  R. 50-1 at 41.  His pain might have started after he fell down in his cell.  R. 48-1 at 25.  Hamilton was then moved to a medical cell, though it is not clear whether the jail staff or the medical staff ordered the move.  R. 50-1 at 37, 41.  At some point, Hamilton was placed in an isolation cell for a few days before being moved back to the medical cell.  *Id.* at 41–42.  Beginning on the day he entered the medical cell, Hamilton made daily requests to be taken to a hospital.  He directed these requests to both the jail staff and the medical staff, depending on who walked by his cell that day.  *Id.* at 43.  Sometimes he would explain why and say he was experiencing pain and numbness; other times he would just make the request.  R. 49-1 at 15–17.  Hamilton says the nurses responded by telling him that he was exaggerating his symptoms.  R. 50-1 at 43.  While he was in the medical cell, Hamilton sometimes did not receive his medication because he could not walk to the door to retrieve it from the nurses.  R. 49-1 at 9; R. 50-1 at 43.

Mike Fields, one of Hamilton's cellmates in the medical cell, initially thought Hamilton was lying about his symptoms.  R. 45-3 at 16.  But after a few days he realized that Hamilton was actually ill because Hamilton never sat up or ate.  *Id.*  Fields, a diabetic, began telling the nurses that Hamilton "was in bad shape" every time the nurses gave him an insulin

shot.  *Id.* at 17.  At least once, Fields told a nurse whose name he cannot remember that Hamilton had soiled himself.  *Id.*  Fields believes the nurses were aware of Hamilton's condition.  *Id.* at 18.

Hamilton's sister Cheryl Ray became concerned about his health after visiting him in prison.  During two of her visits, Ray delivered refills of Hamilton's prescriptions to Nurse Monica Morris, the head nurse.  R. 48-1 at 7; R. 47-1 at 9.[1]  During one visit, Ray remembers that Hamilton was very weak, told her that he had just soiled himself, and was unable to continue their conversation.  R. 48-1 at 12.  Ray asked that the jail staff to return Hamilton to his cell, and then she called Hamilton's daughter Heather Baker to tell her about Hamilton's condition.  *Id.*

Baker in turn relayed her concerns to the jail staff and medical staff.  She called Rodney Scott, the Jailer, who told her that the jail medical staff handled health issues and would treat Hamilton.  R. 47-1 at 8.  Pike County contracted with Southern Health Partners, a private firm, to provide medical care at the Pike County Jail.   R. 46-1 at 4, 5.  Southern Health Partners provided nurses at the jail for sixteen hours a day, seven days a week.  The company also provided a doctor who visits the jail once a week and is on call at all times.  *Id.* at 5, 8.  Baker asked Jailer Scott if he would have a member of the medical staff contact her, and he responded that he would.  R. 47-1 at 9.  Nurse Morris contacted Baker, told her Hamilton was in the medical pod, and said Dr. Waldridge would be examining Hamilton.  *Id.*

---

[1] Nurse Morris stated during her deposition that she had not had or alternatively could not recall any contact with Hamilton's family members before September 24.  R. 76-1 at 27, 71–72.  She also stated that she had not heard about any complaints from Hamilton's family prior to the 27th.  R. 76-1 at 41.  For the purposes of summary judgment, the Court must accept Baker and Ray's testimony on this disputed issue of fact.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) (explaining that a district court must "view the facts in the light most favorable to the nonmovant" but need not "accept mere allegations that are not supported by factual evidence").

Nurse Morris also told Baker that Hamilton was not getting up to take his medication, Hamilton was being stubborn, and he was detoxing. *Id.*

Dr. Waldridge saw Hamilton on Friday, September 24, and he performed a physical exam during that visit. R. 50-1 at 44. Dr. Waldridge was the independent contractor Southern Health Services hired to provide medical services at the Pike County Jail. R. 51-1 at 4. Nurse Morris and Nurse Tina Clevenger were present during the exam. R. 76-1 at 19. Dr. Waldridge found nothing during his examination that would explain Hamilton's complaint of impaired mobility and shortness of breath. R. 51-1 at 22. He noted that Hamilton might be "malingering" or feigning his symptoms. R. 43-9 at 1. He thought that Hamilton's symptoms might be the result of drug interactions, so he discontinued three of Hamilton's medications. *Id.*; R. 51-1 at 18. After the examination, Dr. Waldridge called Baker and told her that Hamilton was detoxing from alcohol, which was why he was feeling ill. He stated that Hamilton's symptoms were consistent with detoxing and that the medical staff would take care of Hamilton. R. 47-1 at 10, 41.[2]

The next day Ray visited Hamilton again, thought that Hamilton was getting worse, and called Baker to tell her that. *Id.* at 11. Nurse Morris was off duty that weekend, and Nurse Rose Ray was on staff. R. 76-1 at 10–11; R. 75-1 at 17. Nurse Ray's notes from that day state that Hamilton complained of "not being able to get on [his] feet to walk" and that others had helped him to the shower. R. 43-9 at 2; R. 75-1 at 60. Nurse Ray does not remember Hamilton or anyone else telling her that Hamilton was soiling himself. R. 75-1 at 33, 61. Nurse Ray called Dr. Waldridge, who prescribed a multivitamin. *Id.* at 6; R. 43-9 at

---

[2] Dr. Waldridge and Nurse Morris both deny that, or alternatively do not remember that, Hamilton was in detox. R. 51-1 at 15; R. 76-1 at 66. But on summary judgment the Court must view the facts in the light most favorable to Hamilton. *See Chappell*, 585 F.3d at 906.

2. The content of their discussion is unclear because neither Nurse Ray nor Dr. Waldridge remembers the conversation.  R. 75-1 at 66; R. 51-1 at 19.  Nurse Ray believes that, given the notations on Hamilton's chart, she would have told Dr. Waldridge of Hamilton's complaints.  R. 75-1 at 61–62.  Dr. Waldridge believes that had she done so, he would have ordered further tests instead of prescribing a multivitamin.  R. 51-1 at 19–20.  Nurse Ray in turn believes that had Dr. Waldridge ordered more tests, she would have written the results down in the chart.  R. 75-1 at 62.

At some point[3] Baker began calling Jailer Scott daily, explaining that even though Nurse Morris said Hamilton was fine, Cheryl Ray's visits made her think that Hamilton was actually sick.  R. 47-1 at 11.  During that time, Baker felt like she "lived on the phone . . . trying to beg for somebody to take [Hamilton] to the hospital."  *Id.* at 38.  Baker asked Jailer Scott to take Hamilton to the hospital, but Jailer Scott told her that the doctor had to sign off before Hamilton could be taken to the hospital.  *Id.* at 13.  When Baker called, Jailer Scott would transfer her calls to the medical staff.  R. 46-1 at 11.

The day before he was taken to the hospital, Hamilton remembers feeling "terrible."  R. 50-1 at 45.  His legs and hips were bothering him, he couldn't walk, and he had trouble breathing.  *Id.*

The next morning, Nurse Morris entered his cell to provide Hamilton with his medications.  She did so because Hamilton would not come to the door of the cell.  R. 76-1 at

---

[3] In his brief, Hamilton estimates that these calls began about a week before Hamilton was taken to the hospital.  R. 63 at 4.  The portions of the deposition cited are unclear on this point.  Baker estimated that she began calling Jailer Scott about a week before Hamilton was taken to the hospital, which would be around September 20.  R. 47-1 at 12.  But she also stated that she began calling daily after Dr. Waldridge saw Hamilton, which would have been only two days before Hamilton was taken to the hospital.  R. 47-1 at 10–11.  The date of Baker's calls is relevant to only Hamilton's claims against Jailer Scott.  As explained below, even assuming Baker's daily calls lasted a week, there was no section 1983 violation.  *See infra* at 11.

30–31.  Nurse Morris thought that Hamilton was "alert and oriented . . . [and] not in any form of distress."  *Id.* at 30.  Around noon that day, Baker called Jailer Scott, who said that he would go talk to the medical staff and see what they could do.  R. 47-1 at 13.  An hour or so later, Nurse Morris called Baker and said that Dr. Waldridge did not think Hamilton needed to go to the hospital.  *Id.* at 13.  Cheryl Ray then went to the jail to request that Hamilton be taken to the hospital.  R. 48-1 at 8.  She told Jailer Scott that he was "going to let [her] brother lay here and die."  *Id.* at 9.  At that point, Jailer Scott brought Nurse Morris into the office and then left.  *Id.*  Nurse Morris said she would contact Dr. Waldridge.[4]  *Id.* The meeting lasted only a few minutes.  Soon after that, both Nurse Morris and Jailer Scott called Baker back and told her that Dr. Waldridge had approved the trip to the hospital and that Hamilton was on his way there.  R. 47-1 at 13.  Hamilton was taken to the hospital late that evening.  *See* R. 43-10 at 1.

The Pikeville Medical Center records state that Hamilton was "essentially unresponsive and not breathing" at the time of admission.  *See id.*  After receiving oxygen and fluids, he told the medical center staff that he had abdominal pain that had increased over the previous few days.  *See id.*  Hamilton was diagnosed with acute renal failure, rhabdomyolysis, metabolic acidosis, uremia, hyperglycemia, a retroperitoneal hematoma, altered mental status, hypertension, initial bradycardia, and transient apnea.  *See id.* at 2. Those conditions were "possibility [sic] from trauma to his right flank initiating the majority

---

[4] Nurse Morris's account of the day's events is different.  She stated that the first time she had contact with a member of Hamilton's family was when she met with Cheryl Ray on the afternoon of September 27.  R. 76-1 at 41, 71.  After Cheryl Ray requested that Hamilton be taken to a hospital, Nurse Morris states that she checked with Jailer Scott and Dr. Waldridge, who both approved the transfer.  *Id.* at 44.  Then Nurse Morris arranged for Hamilton to be transported to the hospital.  *Id.*  Dr. Waldridge also remembers being called only once.  During that call someone told him that Hamilton seemed to be worse, so he approved Hamilton's transfer to a hospital.  R. 51-1 at 20.  On summary judgment, however, this Court must view the facts in the light most favorable to Hamilton.  *See Chappell*, 585 F.3d at 906.

of the symptoms." *Id.*  A few days later, the medical center entered a final diagnosis of a retroperitoneal bleed, resolving rhabdomyolysis, resolving acute renal failure, deep venous thrombosis of the right lower extremity, and sepsis.  R. 43-11 at 1.

Hamilton was discharged from the Pikeville Medical Center on October 8, 2010, and transferred to the University of Kentucky Medical Center.  *Id.* at 4.  Doctors there treated him for deep venous thrombosis and an inferior vena cava clot, retroperitoneal hematoma, a pressure ulcer, and renal failure secondary to rhabdomyolysis.  R. 43-12 at 1.  Hamilton was discharged after six days and returned home for house arrest.  *Id.* at 3; R. 47-1 at 36. Hamilton learned that he had MSRA at some point after he left the jail.  R. 50-1 at 51, 53. Hamilton later returned to Pikeville Medical Center where he had surgery to treat his blood clots in his leg and thigh.  *Id.* at 53.  Hamilton now uses a wheelchair when he needs to travel any significant distance, and he sometimes uses a cane for shorter distances.  *Id.* at 51.  He is still being treated for blood clots and a MRSA infection.  *Id.*

Hamilton filed suit against eight defendants.  R. 18-1.  He sued Pike County, Jailer Rodney Scott, Southern Health Partners, Inc., and Dr. Ron Waldridge.  He also named Nurses Tina Clevenger, Monica Morris, and Rose Ray as both individuals and in their official capacities as nurses at the Pike County Jail.  Finally he named "John and Jane Does 1–10" as defendants.  His suit raises one federal claim and five state law claims against each defendant.  The federal claim is under 42 U.S.C. § 1983, which allows plaintiffs to recover damages for constitutional violations by state actors.  *See id.* at 5–6.  The state law claims are for:  (1) negligence, (2) gross negligence, (3) intentional infliction of emotional distress, (4) the tort of outrage, and (5) violations of various state statutes and administrative regulations. *See id.* at 6.  Hamilton seeks punitive damages for all of his claims.  *See id.* at 7.

Six of the eight defendants have now filed for summary judgment.  Jailer Scott and Pike County filed one motion.  R. 43.  Southern Health Partners, Dr. Waldridge, and Nurses Clevenger and Ray (the medical defendants) filed a separate motion.  R. 45.

## DISCUSSION

Summary judgment is appropriate when the moving party is entitled to judgment as a matter of law because there are no genuine issues of material fact in dispute.  *See* Fed. R. Civ. P. 56.  The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party must respond with "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  This Court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.  When determining whether there is a genuine issue for trial, the Court views the evidence and draws "all justifiable inferences" in favor of the nonmoving party.  *Id.* at 255.  A mere "scintilla" of evidence in support of the non-moving party's position is insufficient to defeat summary judgment.  *Id.* at 251.

## I.    Pike County, Kentucky

Hamilton correctly concedes that summary judgment is appropriate for both his Section 1983 and his state law claims against Pike County, Kentucky.  *See* R. 63 at 1 n.1. Counties are liable under section 1983 if a constitutional violation results from an official policy or custom of that county.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690

(1978).  As Pike County points out, there is no evidence that the County maintained a policy or custom encouraging or resulting in the disregard of inmates' medical needs.  Instead, the evidence shows that Pike County increased the medical staff presence at the Pike County Jail by hiring Southern Health Partners.  R. 46-1 at 4–5.  And Pike County Jail's stated policy is to provide inmates with medical care "comparable to that available to citizens in the surrounding community."  R. 43-6 at 2.  As for Hamilton's state law claims, "Kentucky counties are cloaked with sovereign immunity."  *Lexington-Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004).  Kentucky has not waived its immunity against tort suits or suits for violations of administrative regulations such as Hamilton's.  Therefore summary judgment in favor of Pike County on Hamilton's Section 1983 and state law claims is appropriate.

## II.    Jailer Rodney Scott

Jailer Scott argues summary judgment on Hamilton's Section 1983 claims is appropriate both because he did not commit a constitutional violation and because he is entitled to qualified immunity.[5]

Jailer Scott is entitled to qualified immunity because he did not violate Hamilton's constitutional rights.   Qualified immunity shields government officials performing discretionary functions from liability under Section 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (internal

---

[5] Hamilton sued Jailer Rodney Scott in both his official and personal capacities.  In Kentucky, a county Jailer is an officer of the county and shares the county's sovereign immunity.  *See* Ky. Const. § 99; *Commonwealth Bd. of Claims v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001).  Therefore, summary judgment against Hamilton on claims against Jailer Rodney Scott in his official capacity is appropriate.  Hamilton concedes this point. *See* R. 63 at 1 n.1.

quotation omitted).  In resolving a government official's claim of qualified immunity, courts look to whether (1) the plaintiff has alleged or shown facts establishing the violation of a constitutional right, and (2) the right at issue was "clearly established" at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Courts may decide those two questions in any order.  *Id.* at 236.  When government officials wrongly deprive a prisoner of medical care, they violate that prisoner's constitutional rights.  *See DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).  But Jailer Scott is still entitled to qualified immunity because the plaintiff has failed to point to facts demonstrating that Scott violated his constitutional rights.

The Eighth Amendment is incorporated against the states through the Fourteenth Amendment and prohibits punishments that "'involve the unnecessary and wanton infliction of pain.'"  *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2006) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  A prison official or member of the prison medical staff violates the Eighth Amendment when he is deliberately indifferent to a prisoner's serious medical needs.  *See Estelle*, 429 U.S. at 104–05.  Deliberate indifference requires more than negligence.  The defendant must have "recklessly disregard[ed]" a "substantial risk of serious harm to a prisoner."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  A deliberate indifference claim therefore has an objective component and a subjective component.  First, the plaintiff must show "that the medical need at issue [wa]s sufficiently serious."  *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir. 2001) (quotation omitted).  Second, the plaintiff must show that the defendant was actually aware of a substantial medical risk to the plaintiff and that the defendant disregarded that risk.  *Id.* at 703.

10

Jailer Scott concedes the objective component of the deliberate indifference test, so the dispute is over the subjective component. At the summary judgment stage, Hamilton must point to facts that show Jailer Scott "could have perceived a substantial risk of serious harm to [Hamilton]." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). Hamilton offers two facts to meet that burden, and the second is sufficient. First, Baker stated that she called Jailer Scott on a daily basis for around a week asking that Hamilton be taken to the hospital. During most of those calls, Baker explained that although the medical staff said Hamilton was fine, her aunt had visited Hamilton and did not think he was okay. R. 47-1 at 11. Those calls simply show that Baker disagreed with how the jail medical staff was handling Hamilton's care. Baker did not point to a specific medical condition, so her calls are not evidence that Jailer Scott perceived a serious medical risk to Hamilton. *See Young v. Martin*, 70 F. App'x 256, 261 (6th Cir. 2003) (finding that family members' "vague and generalized concern for [a prisoner's] well-being and medical care" was not enough to put a warden on notice of the prisoner's serious medical condition). Second, Baker also stated that during two of her calls to Jailer Scott she told him: (1) that Cheryl Ray said Hamilton looked ill and said he had fallen and could not get up, and (2) that Hamilton was soiling himself, not eating, and not taking his medicine. R. 47-1 at 10–11, 40–41. Baker did not specify when she relayed this information to Scott. The Sixth Circuit has held that "obvious signs of reoccurring incontinence and debilitating immobility [are] clear symptoms of a serious problem." *Taylor v. Franklin Cnty., Ky.*, 104 F. App'x 531, 538 (6th Cir. 2004). Jailer Scott argues that these calls could not have put him on notice of a serious risk to Hamilton because neither he nor Baker had ever directly observed Hamilton's symptoms. *See* R. 70 at 4, 7–8. But Jailer Scott offers no reason why third-party information is so

unreliable that no reasonable fact-finder could conclude that he believed Baker and perceived a serious medical risk to Hamilton.  The two calls therefore do raise a genuine issue of material fact as to whether Jailer Scott perceived of a serious medical risk to Hamilton.

But even if Jailer Scott was aware of a serious medical risk to Hamilton, there is no evidence that he consciously disregarded that risk.  "'[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Baker, the only member of Hamilton's family who had prolonged contact with Jailer Scott, testified that Jailer Scott was responsive to her concerns.  R. 47-1 at 17.  She asked Jailer Scott to have a member of the medical staff call her during their first call, and he did. R. 47-1 at 9.  After that he consistently referred her calls to the medical staff.  When Baker asked him to send Hamilton to the hospital, he explained to her that the decision to do so was up to the medical staff, not him.  R. 47-1 at 11.  Once Dr. Waldridge approved Hamilton's transfer to the hospital, Jailer Scott approved the transfer as well.

Moreover, Jailer Scott reasonably relied on the assumption that the medical staff would attend to Hamilton's medical needs.  Jailer Scott testified that Southern Health Partners had medical authority at the jail and that he expected them to deal with medical issues.  R. 46-1 at 14.  He had received "hardly [] any" complaints about the medical staff at the jail while he was in charge.  R. 46-1 at 8.  Non-medical prison officials, such as Jailer Scott, act reasonably when they rely on the judgment of the prison medical staff.  *See Ronayne v. Ficano*, 173 F.3d 856, at *3 (6th Cir. 1999) (unpublished table decision) ("Supervisory officials are entitled to rely on medical judgments made by medical

professionals responsible for prisoner care."); *see also Phillips v. Tiona*, 2013 WL 239891, at *6 (10th Cir. 2013) (reasonable reliance on the medical staff "negates rather than supports liability" (quotation omitted)); *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) (holding that prison officials were entitled to rely upon a nurse's medical opinion); *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006) (finding no deliberate indifference when prison official made sure the medical staff was addressing the issue and deferred to their judgment); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (holding that where a prisoner is cared for by medical personnel "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands" unless there is reason to believe that the medical staff is not treating or mistreating a prisoner).   Hamilton argues that Jailer Scott's reliance on the jail medical staff was unreasonable because Jailer Scott never checked to make sure that Hamilton had been treated.  R. 63 at 19.  But again, there was no history of complaints about the jail medical staff that call into question Jailer Scott's assumption that Hamilton was receiving adequate treatment.   And when Baker called Jailer Scott, she told him the medical staff was providing Hamilton with care and that the medical staff's opinion was that Hamilton was "okay."  R. 47-1 at 11.

Hamilton also argues that Jailer Scott had the authority to supervise and override medical decisions and that the failure to do so shows he disregarded a serious medical risk to Hamilton.[6]  R. 63 at 21–22.  The fact that a defendant "had a job to do and did not do it," may support a conclusion that the defendant disregarded a serious medical risk.  *Young ex rel. Estate of Young v. Martin*, 51 F. App'x 509, 515 (6th Cir. 2002).  However, Hamilton

---

[6] Jailer Scott interprets this argument as a new claim against Jailer Scott based on supervisory liability.  R. 70 at 10–11.  He misunderstands Hamilton's argument, which is simply that Jailer Scott's failure to do his job is proof that he disregarded the serious medical risk to Hamilton.

has not shown that it was Jailer Scott's job to override the medical staff.  The statutes and regulations Hamilton cites do not require jailers to veto medical decisions or set out any criteria under which they must do so.  *See* Ky. Rev. Stat. § 71.040 (stating that if an arrestee needs emergency medical care, he shall receive it prior to admission into a jail and that jailers must treat inmates humanely); 501 Ky. Admin. Regs. § 3:090 (stating that emergency care shall be provided when needed and setting out a procedure for transferring inmates when the care they need is not available at their current location).  Nor does the jail's medical policy.  R. 43-6 at 2 (stating that "Southern Health Partners is responsible for medical services . . . and shall not be restricted by the jailer in their performance[]").  Indeed, the jail's "emergency medical services" policy cited by Hamilton undermines his position.  In the event of a medical emergency, the jail officer is supposed to contact Southern Health Partners and then comply with the physician's orders regarding transportation to Pikeville Medical Center or treatment.  *See* R. 63-1 at 3–4.  Furthermore, Kentucky regulations specifically prohibit jailers from "restrict[ing]" the health care staff's performance of their duties.  501 Ky. Admin. Regs. § 3:090(1)(3).  Jailer Scott did concede that he is responsible for supervising Southern Health Partners, but he viewed his role as limited to investigating complaints.  R. 46-1 at 8.  Therefore, Hamilton has not offered any evidence from which a fact-finder could conclude that Jailer Scott disregarded a serious medical risk to Hamilton by failing to perform his job as a jailer.

Hamilton also argues in passing that Jailer Scott disregarded a medical risk to Hamilton by delaying Hamilton's transportation to the hospital.  *See* R. 63 at 19–20.  The decision to send Hamilton to the hospital was made in the late afternoon, and Hamilton arrived at the hospital in the late evening.  There is no evidence in the record that explains, or

even hints at, the cause of the delay.  Therefore, there is no evidence that suggests Jailer Scott was responsible for the delay.  To the contrary, all of the evidence, including Baker's deposition testimony, depicts Jailer Scott as someone willing to act when he had the power to do so.  Therefore, Hamilton has not met his burden on summary judgment of pointing to facts showing that Jailer Scott delayed his transportation to the Pikeville Medical Center.

Along with his federal claim, Hamilton raised five state law claims against Jailer Scott:  (1) intentional infliction of emotional distress, (2) the tort of outrage, (3) negligence, (4) gross negligence, and (5) violations of various statutory and regulatory provisions. Hamilton concedes summary judgment is appropriate in favor of Jailor Scott on the first two claims.  *See* R. 63 at 23 n.1.  Jailer Scott did not move for summary judgment on the third and fourth claims, so they remain pending.[7]  With respect to the fifth claim, Jailer Scott argues that Hamilton's complaint failed to identify which sections of the statutes and regulations Jailer Scott violated and to explain those violations.  *See* R. 43 at 19–20.  In response, Hamilton states that he has proven a violation of the various Kentucky statutes and administrative regulations mentioned in the complaint.  R. 63 at 24.  But he has not.  The Court agrees with Jailer Scott that Hamilton has failed to develop the argument and point to facts that make out a violation.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (internal quotation and ellipses omitted));

---

[7] Hamilton's response brief urged the Court not to grant the defendants summary judgment on his negligence and gross negligence claims.  R. 63 at 23–24.  Jailer Scott never moved for summary judgment on those claims, so of course the Court has no reason to grant summary judgment on those claims.  For the same reason, the Court also has no reason to consider the new argument made in Jailer Scott's reply brief that he is entitled to qualified official immunity on all of Hamilton's state law claims.  *See* R. 70 at 12–13; *see also Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 674 (E.D. Ky. 2009) ("[I]ssues may not be raised in district court for the first time in a reply brief.").

*see also* R. 63 at 24 (arguing only that if Jailer Scott violated the Kentucky statutes and regulations, those violations would constitute negligence per se).  Because Hamilton has not met his burden of explaining why a genuine issue of material fact exists on his standalone administrative and statutory claims, summary judgment in favor of Jailer Scott is appropriate.

## III.   Southern Health Partners

Hamilton correctly concedes that summary judgment is appropriate for his Section 1983 claims against Southern Health Partners.  *See* R. 64 at 1 n.1.  Southern Health Partners is a private corporation under contract with the Pike County Jail.  Thus, Southern Health Partners is liable under Section 1983 only if one of its own official policies or customs caused a violation of Hamilton's constitutional rights.  *See Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  Hamilton offers no proof that a policy or custom of Southern Health Partners caused a violation of his constitutional rights.  Summary judgment in favor of Southern Health Partners is therefore appropriate.

Because Southern Health Partners did not move for summary judgment on Hamilton's state law claims, those claims survive summary judgment.  The first time the state law claims against Southern Health Partners are mentioned is in the medical defendants' reply brief.  *See* R. 71 at 7–8.  "However, issues may not be raised in district court for the first time in a reply brief."  *Fastenal Co.*, 609 F. Supp. 2d at 674.  Earlier in this litigation, the Court granted a motion *in limine* by the medical defendants that excluded certain testimony by Nurse Madeline LaMarre, Hamilton's expert witness.  *See* R. 61.  The Court granted the motion in mid-December after the defendants filed their motions for summary judgment.  The medical defendants argue that they could not have briefed the state law claims without first knowing the outcome of the motion *in limine*.  *See* R. 71 at 7–8.

16

Even assuming that is true, three weeks elapsed between the ruling on the motion *in limine* and the date Hamilton filed his response brief.  The medical defendants could have asked for permission to supplement their summary judgment motion during that time, but they chose not to.  By waiting until the reply brief to contest the state law claims, the medical defendants created a situation in which Hamilton could not respond.  Ruling on the state law claims would be unfair to Hamilton, and the medical defendants offer no compelling reason to override this concern.  Therefore, summary judgment on Hamilton's state law claims against the medical defendants, including Southern Health Partners, is not appropriate.

## IV.    Nurse Tina Clevenger

Hamilton does not contest the motion for summary judgment with respect to his Section 1983 claim against Nurse Clevenger.  *See* R. 64 at 1 n.1.  Therefore, summary judgment on Hamilton's Section 1983 claim against Nurse Clevenger is appropriate.  As previously explained, Hamilton's state law claims against Nurse Clevenger survive summary judgment because the medical defendants waited until the reply brief to raise their arguments on these claims.[8]

## V.    Dr. Ron Waldridge

Like Jailer Scott, Dr. Waldridge moves for summary judgment on Hamilton's Section 1983 claims both because he did not violate the Eighth Amendment and because he is entitled to qualified immunity.  Dr. Waldridge is an independent contractor working for Southern Health Partners, a private corporation.  R. 51-1 at 4.  That means that although he is a state actor for the purposes of section 1983, he "is not entitled to assert qualified

---

[8] Hamilton sued the three nurses—Tina Clevenger, Monica Morris, and Rose Ray—in both their official and personal capacities.  The medical defendants' motion for summary judgment did not explicitly seek summary judgment in favor of the nurses in both their official and personal capacities.  Therefore the Court treats the motion for summary judgment as one only relating to the personal capacity claims.

immunity." *McCullum v. Tepe*, 693 F.3d 696, 700, 704 (6th Cir. 2012) ("[T]here does not appear to be any history of immunity for a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law.").

The only issue is whether there is a genuine issue of material fact as to whether Dr. Waldridge was deliberately indifferent to Hamilton's medical needs. As summarized earlier, a deliberate indifference claims has two components: (1) the plaintiff must show he had a sufficiently serious medical need, and (2) the plaintiff must show that the defendant was aware of a serious medical risk to the plaintiff and disregarded that risk. *See Comstock*, 273 F.3d at 702–03.

In his reply brief, Dr. Waldridge mentions in passing that Hamilton cannot prove the objective component of his deliberate indifference claim. A serious medical need is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (internal quotation omitted). Dr. Waldridge points to Hamilton's cellmate Fields's statement that he initially believed Hamilton was faking his symptoms. Dr. Waldridge argues that because he examined Hamilton only briefly, his suspicion that Hamilton was faking his symptoms was reasonable given Fields's initial doubts. R. 71 at 10. However, this argument conflates the objective and subjective prongs. The objective prong simply asks whether Hamilton clearly needed medical attention. Viewing the facts in the light most favorable to Hamilton, he was unable to walk, had soiled himself multiple times, and was having trouble breathing. Those symptoms qualify as an obviously serious medical condition. *See Taylor*, 104 F. App'x at

538.  Thus, Hamilton has pointed to facts sufficient to raise a genuine issue of material fact on the objective competent.

Hamilton offers two reasons why Dr. Waldridge's actions satisfy the subjective competent of his deliberate indifference claim.  His first argument is that Dr. Waldridge's examination and conclusions on September 24 were so inadequate as to amount to deliberate indifference.  But the facts do not support Hamilton's allegation. Dr. Waldridge conducted an exam and could not determine why Hamilton was having trouble walking and breathing.  Dr. Waldridge checked Hamilton's blood pressure, pulse, and oxygen levels.  R. 43-9 at 1.  He also performed a physical exam that included checking Hamilton's heart sounds, extremities, and abdomen, and he found nothing unusual.  *Id.*; R. 51-1 at 16.  Dr. Waldridge hypothesized that Hamilton's symptoms might be either feigned or the result of drug interactions.  R. 43-9 at 1.  So he decided to discontinue some of Hamilton's medications.  *Id.*; R. 51-1 at 17.  Hamilton faults Dr. Waldridge for not figuring out that Hamilton was seriously ill.  R. 64 at 25–26.  He focuses on Hamilton's ultimate diagnoses upon admission to the Pikeville Medical Center and argues that Dr. Waldridge's failure to identify any of them amounts to deliberate indifference.  *Id.*  However, "[n]egligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference."  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 945 (6th Cir. 2010) (quotation omitted).  Hamilton does not point to any evidence that Dr. Waldridge knew or should have known that Hamilton had any particular ailments.  Even when all the facts are viewed in the light most favorable to Hamilton, there is no evidence that Dr. Waldridge was aware that Hamilton was fully unable to walk or was soiling himself at the time of the examination.  Hamilton stated that he told Dr. Waldridge that he was having trouble walking, not that he was totally immobile.  R. 50-1 at 44.  And Dr. Waldridge

19

recalls Hamilton walking into the exam room. R. 51-1 at 17. Hamilton points to statements by his sister and his cellmate who said they knew something was wrong with Hamilton, but those statements do not shed light on what Dr. Waldridge knew. Dr. Waldridge has offered an explanation for his diagnosis and treatment plan. *See, e.g.*, *id.* at 17–18 (testimony by Dr. Waldridge that he took Hamilton off his psoriasis medication that was known to have side effects consistent with Hamilton's symptoms). Hamilton has not pointed to any facts showing that a diagnosis that he was malingering or suffering from pharmaceutical side effects was "grossly inadequate care." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). When, as here, a prisoner "received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound is state tort law." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quotation omitted). Thus, Hamilton has not shown that Dr. Waldridge disregarded a serious medical risk to Hamilton during the examination on September 24.

Hamilton's second argument is that Dr. Waldridge exhibited deliberate indifference on September 25, by prescribing a multivitamin after learning Hamilton was unable to walk and needed help to reach the shower. Viewed in the light most favorable to Hamilton, Nurse Ray called Dr. Waldridge the day after she examined Hamilton. She reported that Hamilton was complaining of "not being able to get on [his] feet to walk" and needing to be "helped . . . to have a shower." R. 43-9 at 1; R. 75-1 at 61. Dr. Waldridge argues that Hamilton just repeated the complaints he had made the day before, and that Dr. Waldridge decided to continue his treatment plan. *See* R. 71 at 15. That might be a reasonable interpretation of the evidence. But it is also reasonable to interpret Hamilton's complaints as describing an

20

escalation of his symptoms—from having trouble walking to being unable to walk at all.  *See* R. 64 at 28.  And at this stage, that reasonable inference must be drawn in Hamilton's favor.

As with his first argument, Hamilton's claim is that Dr. Waldridge's treatment (here, prescribing a multivitamin) was inadequate.  To succeed on this claim, Hamilton must show "that he received grossly inadequate care in the face of a decision to take an easier but less efficacious course of treatment."  *Scott v. Ambani*, 577 F.3d 642, 650 (6th Cir. 2009) (internal quotations omitted).  Hamilton's case resembles *Jones v. Muskegon Cnty.*, 625 F.3d 935 (6th Cir. 2010).  There, the Sixth Circuit stated that the prescription of a laxative in response to complaints of substantial weight loss and severe stomach pain "seem[ed] inappropriate."  *Id.* at 945.  However, the Court affirmed a grant of summary judgment because those symptoms were consistent with the doctor's diagnosis of constipation, the doctor scheduled follow up exams, and the doctor transferred the patient to a hospital once his condition worsened.  *Id.*  Here, Dr. Waldridge conceded that his "typical response" in response to Hamilton's complaints would not have been the prescription of a multivitamin.  R. 51-1 at 20.  There is no evidence that immobility, as opposed to impaired mobility, is consistent with his initial diagnosis of drug interactions.  And there is no evidence that Dr. Waldridge ever followed up with Hamilton or ordered further tests.  Dr. Waldridge did approve Hamilton's transfer to the hospital, but he made that decision on September 27th, two days after a nurse told him that Hamilton's condition had worsened.  *Id.*  When the evidence is viewed in the light most favorable to Hamilton and all plausible inferences are drawn in his favor, a fact-finder could find that Dr. Waldridge was deliberately indifferent.  It is at least plausible that Dr. Waldridge knew of a serious medical risk—Hamilton's inability to walk—and disregarded that risk by prescribing only a multivitamin in response.

Therefore, summary judgment on Hamilton's Section 1983 claims against Dr. Waldridge is inappropriate.

Hamilton's state law claims against Dr. Waldridge survive summary judgment because, as explained earlier, the medical defendants waited until the reply brief to raise their qualified immunity arguments.

## VI.   Nurse Rose Ray

Nurse Ray also argues that she is entitled to summary judgment on Hamilton's Section 1983 claim on qualified immunity grounds and because she did not violate Hamilton's Eighth Amendment rights.   Nurse Ray was an employee or an independent contractor of Southern Health Partners, a private corporation.   Therefore, she is a state actor for the purposes of section 1983, but she may not assert a qualified immunity defense.   *See Harrison v. Ash*, 539 F.3d 510, 521, 525 (6th Cir. 2008) (reviewing the "history and purpose of qualified immunity, as well as the case law interpreting the scope of the doctrine" and concluding that nurses employed by a private medical provider are not entitled to qualified immunity).   The remaining issue is whether there is a genuine issue of material fact as to whether Nurse Ray was deliberately indifferent to Hamilton's medical needs.

At the start of her shift on Saturday, September 25, Nurse Ray read Hamilton's chart to see if Dr. Waldridge had left her any orders.  R. 75-1 at 59.  At some point after that, she called Dr. Waldridge to relay Hamilton's complaints about being unable to walk and needing to be helped to shower.  She gave Hamilton a multivitamin, per Dr. Waldridge's instructions.  R. 43-9 at 1.  She does not remember seeing Hamilton after that.  R. 75-1 at 68.

Hamilton argues that Nurse Ray was deliberately indifferent to his medical needs because she did not check on Hamilton after providing him with a multivitamin.  Viewing

22

the evidence in Hamilton's favor, Nurse Ray was aware of a serious medical risk: Hamilton's inability to walk.  *See id.* at 77 (deposition testimony of Nurse Ray that the inability to walk might be a sign of a serious medical condition).  Nurse Ray responded to that risk by calling Dr. Waldridge, who did not order her to take further action beyond providing Hamilton with a multivitamin.  Nurse Ray's deference to Dr. Waldridge's course of treatment was not deliberate indifference.  *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("Nurses may generally defer to instructions given by physicians, but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." (quotation omitted)).  Nurse Ray provided an explanation for why she followed Dr. Waldridge's order:  She knew that Dr. Waldridge had seen Hamilton in person the day before her call with Dr. Waldridge about Hamilton.  R. 75-1 at 67.  Furthermore, Nurse Ray was not licensed to independently diagnose conditions, devise treatment plans, or prescribe medicine.  R. 76-1 at 54, 63.  Hamilton's need for additional treatment was not so obvious that Nurse Ray's deference to Dr. Waldridge's order was deliberate indifference.  *See Williams v. Simpson*, 509CV-31-R, 2010 WL 5186722, at *7 (W.D. Ky. Dec. 15, 2010) (applying *Holloway* and finding no deliberate indifference because a nurse was "shielded by [the doctor's] diagnosis" where nurse had only one encounter with an inmate, contacted a doctor, and accepted the doctor's diagnosis of malingering as reasonable).  Hamilton's complaint about Nurse Ray's failure to check on him amounts to a "dispute is over the adequacy of the treatment," and "federal courts are generally reluctant to second guess medical judgments." *Graham*, 358 F.3d at 385.  Therefore, Nurse Ray's failure to check on Hamilton does not support a constitutional claim of deliberate indifference.

Alternatively, Hamilton argues that Nurse Ray was deliberately indifferent because she concealed Hamilton's complaints from Dr. Waldridge.  Dr. Waldridge believes that the only way he would have prescribed a multivitamin is if Nurse Ray had called him and asked him to or said that Hamilton wanted one.  He does not believe he would have done so if Nurse Ray had told him that Hamilton's condition had worsened.  R. 51-1 at 20.  Hamilton argues that if Dr. Waldridge's testimony is credited then Nurse Ray must have chosen not to tell Dr. Waldridge about Hamilton's complaints.  (Of course, the other consequence of crediting Dr. Waldridge's testimony is that Hamilton's section 1983 claim against Dr. Waldridge would fail.)  Hamilton's argument leads to a somewhat hard-to-believe story: A nurse committed to ignoring a patient's need for medical care nonetheless calls a doctor for a multivitamin prescription, either on her own initiative or at the patient's request.  But Hamilton's interpretation of the facts is plausible, and "intentionally denying or delaying access to medical care" is deliberate indifference.  *Estelle*, 429 U.S. at 104–05.  Thus, summary judgment in favor of Nurse Ray on Hamilton's Section 1983 claims is not appropriate.

As with the other medical defendants, Hamilton's state law claims against Nurse Ray survive summary judgment because the medical defendants waited until the reply brief to raise their arguments on the issue.

## VII.   Punitive Damages

Summary judgment on the plaintiff's punitive damages claim is not appropriate.  The medical defendants' motion for summary judgment on this issue is one conclusory sentence stating that no evidence in the record supports a punitive damages claim.  *See* R. 45-1 at 12.  The defendants have not identified the relevant legal standards for punitive damages under

federal and Kentucky law or explained why there is not enough evidence in the record to meet those standards. A party moving for summary judgment has the burden of "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This initial burden is a light one. However, a "defendant should not make a motion for summary judgment, without pointing out the deficiencies of the plaintiff's case, and then expect the court to rule in the defendant's favor." *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, Inc., 452 F.3d 494, 507 (6th Cir. 2006). The medical defendants did just that, so they have not met their initial burden and summary judgment is inappropriate.

## VIII.   John and Jane Does One Through Ten

Hamilton's complaint names "John and Jane Does 1–10" as defendants. R. 18-1 at 1. Hamilton had until April 6, 2012, to identify and serve those defendants, and he has not done so. Accordingly, Hamilton has until Friday, February 15, 2013, to identify and serve John and Jane Does 1–10. If he does not do so, those claims will be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.").

## IX.   The Motions To Strike

Both of the defendants' included new arguments in their reply briefs, which Hamilton moved to strike. R. 73; R 74. The defendants respond that this Court could eliminate any prejudice from their new arguments by allowing the plaintiff to file a surreply. R. 77; R. 78. That might do the trick, but doing so would also eliminate the incentive for movants to

include all of the grounds for their motion in their initial brief.  In any case, the motions are now moot because the Court did not consider the defendants' new arguments.

**CONCLUSION**

Accordingly, it is **ORDERED** that:

(1)     Pike County, Kentucky and Rodney Scott's motion for summary judgment, R. 43, is **GRANTED IN PART AND DENIED IN PART**.

    (a)     The motion is **GRANTED** with respect to all of the plaintiff's claims against Pike County, Kentucky.

    (b)     The motion is **GRANTED** with respect to the plaintiff's claims against Rodney Scott in his official capacity and the plaintiff's section 1983 claim against Rodney Scott in his personal capacity.

    (c)     The motion is **GRANTED** with respect to the plaintiff's intentional infliction of emotional distress, tort of outrage, and statutory and administrative claims against Rodney Scott in his personal capacity.

    (d)     Since defendant Scott failed to properly move for summary judgment, plaintiff's negligence and gross negligence claims will proceed to trial.

(2)     The medical defendants' motion for summary judgment, R. 45, is **GRANTED IN PART AND DENIED IN PART**.

    (a)     The motion is **GRANTED** with respect to the plaintiff's section 1983 claim against Southern Health Partners.

    (b)     The motion is **DENIED** with respect to the plaintiff's state law claims against Southern Health Partners.

(c)     The motion is **GRANTED** with respect to the plaintiff's section 1983 claim against Tina Clevenger in her personal capacity.

(d)     The motion is **DENIED** with respect to the plaintiff's state law claims against Tina Clevenger in her personal capacity.

(e)     The motion is **DENIED** with respect to the plaintiff's section 1983 claim against Dr. Waldridge based on Dr. Waldridge's actions in response to the telephone call from Nurse Ray on September 25, 2010.

(f)     The motion is **GRANTED** with respect to the plaintiff's section 1983 claim against Dr. Waldridge based on Dr. Waldridge's examination and diagnosis of the plaintiff in September 24, 2010.

(g)     The motion is **DENIED** with respect to the plaintiff's section 1983 claim against Nurse Ray in her personal capacity based on her failure to accurately convey Hamilton's symptoms to Dr. Waldridge during their telephone call on September 25, 2010.

(h)     The motion is **GRANTED** with respect to the plaintiff's section 1983 claim against Nurse Ray in her personal capacity based on her failure to take further action after reporting the plaintiff's symptoms to Dr. Waldridge during their telephone call on September 25, 2010, and complying with Dr. Waldridge's instruction to provide the plaintiff with a multivitamin.

(i)     The motion is **DENIED** with respect to the plaintiff's punitive damages claims against the medical defendants.

(3)     Hamilton has until **Friday, February 15, 2013**, to identify and serve John and

Jane Does 1–10.  If he does not do so, those claims will be dismissed without

prejudice.  *See* Fed. R. Civ. P. 4(m).

(4)     The plaintiff's motions to strike, R. 73 and R. 74, are **DENIED AS MOOT**.

This the 11th day of February, 2013.

**Signed By:**

_**Amul R. Thapar**_

**United States District Judge**